# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| EDWARD FLEMING, an individual. | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 1:25-cv-742 |
| v. | ) |
| | ) |
| DAVID BROWN a/k/a DAVID BROWN LEVY a/k/a DAVID RAYMOND BROWN, an individual; SCREENFUND LLC, a Delaware limited liability company; and THE SCREEN COMPANY, INC., a Delaware corporation. | ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff Edward Fleming ("Plaintiff"), by and through undersigned counsel, files this Complaint against Defendants David Brown a/k/a David Brown Levy a/k/a David Raymond Brown; ScreenFund LLC; and The Screen Company, Inc. (collectively, "Defendants"), and alleges as follows:

## THE PARTIES

1. Plaintiff Edward Fleming ("Fleming") is an individual who resides in Golden, Colorado. Fleming is the sole member of Red Junior, LLC.

2. Defendant David Brown a/k/a David Brown Levy a/k/a David Raymond Brown ("Brown" or "Defendant Brown") is an individual who resides in West Columbia, South Carolina. Brown and Fleming are Co-Managers and the only two Members of Film Holdings Capital LLC ("FHC"), a California limited liability company.

1

3. Defendant ScreenFund LLC ("ScreenFund") is a Delaware limited liability company. Based on information and belief, ScreenFund is a subsidiary of The Screen Company, and has its principal place of business in Los Angeles, California. Based on information and belief, Defendant Brown is the sole member of ScreenFund LLC.

4. Defendant The Screen Company, Inc. is a Delaware corporation. Based on information and belief, the Screen Company's principal place of business is in Los Angeles, California.

## JURISDICTION AND VENUE

5. Plaintiff Edward Fleming is a citizen of the United States who currently resides in the state of Colorado.

6. Defendant David Brown is a citizen of the United States who currently resides in the state of South Carolina.

7. Based on information and belief, ScreenFund is a citizen of South Carolina.

8. Based on information and belief, The Screen Company is a citizen of Delaware and California.

9. This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. Section 1332 because the parties are citizens of different states in complete diversity and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10. This Court has personal jurisdiction over Defendants Brown, ScreenFund, and The Screen Company, and each of them, because at all relevant times they were doing business in and directing their efforts towards Plaintiff and Red Junior, LLC and obtaining their funds and cooperation in this District. This Court has personal jurisdiction over Defendants for the additional reason that each of them purposefully directed action at this forum to obtain benefits from their

scheme perpetrated against Plaintiff in this District.

11. Venue is proper in the United States District Court for the District of Colorado, pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in or were directed to the District of Colorado, and Defendants are subject to the Court's personal jurisdiction with respect to this action.

## FACTS COMMON TO ALL CLAIMS

12. On or about January 15, 2024, Fleming was introduced to Brown by a mutual business acquaintance.

13. Brown represented to Fleming that he was a successful movie producer and heavily involved in the movie-lending business.

14. Brown sought Fleming's investment dollars to help fund a business enterprise through which the two, through a jointly owned entity, would provide bridge loans to various movie projects, and realize significant rates of returns on Fleming's (and allegedly Brown's) investment dollars.

15. Brown represented to Fleming that he would be able to leverage his significant contacts within the entertainment industry, as well as significant investment dollars that, along with Fleming's investment dollars, would fund millions of dollars in prospective loans.

16. At the time, Fleming was unaware, and Brown never disclosed, that Brown had been involved in numerous lawsuits in which he had been found guilty/liable for fraud (or fraud-related claims).

17. Had Brown disclosed this information to Fleming, Fleming would never have agreed to invest anything or engage in any business with Brown.

18. As it was, by March 1, 2024, Brown had convinced Fleming to enter into a

business venture with Brown under the name of Film Holdings Capital LLC ("FHC" or the "Company"). FHC was formed for the stated purpose of sourcing and providing bridge loans, tax credit loans, cash rebate loans, senior loans, presale and minimum guarantee loans, gap loans and mezzanine loans in the entertainment industry.

19.  Brown and Fleming formed FHC, a California limited liability company, on March 1, 2024. Brown and Fleming were the only members and co-managers of FHC.

20.  Under FHC's Operating Agreement, Brown and Fleming had joint management responsibilities with authority to "[j]ointly or with written approval by both Members, bind the Company and make any decisions regarding the Company's business and affairs."

21.  Their business plan was for Brown to use his extensive personal connections within the entertainment industry to identify and procure bridge loan opportunities (and other similar types of loan products) for FHC to then fund various film projects that needed temporary funds until they could procure more long-term, traditional loans.

22.  Under their agreement, Brown and Fleming, through the use of his solely-owned investment company, Red Junior, LLC ("Red Junior"), were to receive revenues for each loan transaction undertaken in amounts proportionate to their capital contributions. The example used in the Operating Agreement to clarify the spirit of their agreement is that if Fleming were to contribute $600,000 and Brown contributed $400,000 to fund a loan, "then the revenue will be prorated entirely based off their actual monetary contribution," *i.e.*, Fleming would receive 60% and Brown would receive 40% of the net proceeds of that loan.

23.  Brown established a bank account for FHC at JPMorgan Chase ("Chase Bank"). Brown established the bank account with himself as the sole individual with access to, and control over, the account.

24. Brown provided wiring instruction for the FHC Chase Bank account to Fleming and Fleming's assistant, Ms. Amanda Mitchell (who has functioned as the day-to-day operator of Red Junior since its inception), so that Red Junior could begin investing in loans procured by Brown.

25. Pursuant to the Operating Agreement, Fleming made an initial capital contribution of $325,000.00 to FHC on March 1, 2024, and proceeded to contribute more than $5 million by March 15, 2024 as prompted by Defendant Brown. Fleming made capital contributions between March 1, 2024 and December 20, 2024 in the total amount of $11,324,540.00.

26. Unbeknownst to Fleming, on March 26, 2024, Defendant unilaterally, and without authorization, filed a "Statement of Information" with the Secretary of State, changing the Manager and Member of FHC from Fleming and Defendant Brown to Film Holdings Fund Partners LLC, a limited liability company Defendant had formed a year earlier.

27. This was an improper and invalid action as amendments to the Operating Agreement of FHC (including changing members or managers) can only be done "by the Members, or by the Manager(s) upon written approval of both Members" pursuant to its terms.

28. Knowing he had made this unauthorized change to FHC's governing documents, Brown continued to operate as though there was no such change. He continued to represent investment opportunities to Fleming and asked for wire transfers to be delivered by Ms. Mitchell.

29. As noted above, over $11.3 million was request by Brown and sent by Fleming under the guise of investment opportunities that were paying off large returns and that were protected, secured and insured against loss.

30. These representations were false in nearly every respect.

31. Upon information and belief, many (if not all) of the documents presented to Fleming and Ms. Mitchell by Brown were either fabricated, forged or falsified to induce Fleming to continue to invest his funds into FHC.

32. Over the course of 2024, Brown instructed Ms. Mitchell to wire transfer funds into at least four (4) different banks under entity names that he represented were co-owned by Fleming *or* were just temporarily being used until he could complete the process of setting up accounts with a lender that was purportedly offering FHC better credit terms.

33. These representations were false.

34. Nevertheless, Ms. Mitchell wired funds from Red Junior's bank account to accounts identified by Brown and held in JPMorganChase Bank ("Chase"), Western Alliance Bank ("Western Alliance"), First Citizens Bank ("First Citizens") and Choice Financial Bank ("Choice").

35. As it turns out, many of those accounts were held under the name of entities Fleming was not even aware existed at the time, such as: The Screen Company, Inc., and ScreenFund LLC, for example.

36. Brown represented to Fleming that FHC would be working under the d/b/a of "ScreenFund." Fleming did not know that Brown had formed, in his own name as the sole member and manager, a limited liability company named ScreenFund LLC.

37. Recently, when confronted about Fleming's discovery of the entity named ScreenFund, LLC, Brown represented to Fleming that FHC owned ScreenFund LLC and that Fleming and Brown were 50/50 owners of ScreenFund LLC.

38. Those representations were false.

39. When asked to provide bank records for ScreenFund, Brown has refused to

produce such records, claiming to Fleming's counsel that Fleming is not on the Operating Agreement of ScreenFund, LLC (which Fleming did not know even existed) and, therefore, Brown claimed that he does not have to produce those bank records.

40. In addition to the foregoing, Plaintiff has asked Brown, on numerous occasions, to provide the financial records and bank statements that show where Fleming's funds had been deposited, and when/to where they had been distributed or deployed.

41. To date, Brown has not provided these bank records or financial records and Fleming remains unaware of where or to whom his funds have been distributed under the guise of funding loans (that appear now to have been fabricated).

42. On January 15, 2025, Defendant Brown represented to Fleming that FHC had $681,000.00 "on hand" that Brown wanted to redeploy.

43. At that point in time, Fleming had contributed over $11.3 million, and had received $0 in return from Brown, despite Brown's representations of extraordinary returns and significant cash flow coming in to FHC.

44. Accordingly, Fleming asked for Brown to send him the "on hand" funds as a partial payment toward the net returns Fleming was owed.

45. Instead of delivering the funds to Fleming, Defendant Brown told Fleming that he had already promised those funds (without my authorization as is required by the Operating Agreement) to be deployed for this alleged new loan and was being threatened by the prospective borrowers' attorney. He begged Fleming to allow him to redeploy those funds for this alleged new loan instead of returning them to Plaintiff.

46. Upon information and belief, there was no new valid loan, the funds were not "on hand" and Brown was once again just making up excuses to hide Fleming's money from

7

Fleming.

47. To induce Fleming to agree to his *not* sending those funds to Fleming, Brown said that FHC had a significant repayment coming in on February 7 ($1 million) and another on February 14 ($1.5 million), from which he would send Fleming the funds he needed for other (unrelated) business deal(s).

48. Based on those (false) representations by Brown, Fleming reluctantly agreed to allow his share of those particular proceeds to be (allegedly) redeployed.

49. As the February 7, 2025 repayment date neared, Defendant Brown represented that the $1 million loan proceeds had actually been wired by the borrower, and received by FHC on February 3, 2025.

50. Brown sent Fleming screen shots of text messages as his proof that the wire transfer from FHC's client had been initiated on February 3, 2025.

51. On February 7, 2025, Defendant Brown represented to Fleming that "[FHC] got the $ around 4:30om today. I teed it up for you, it will not process until business hours Monday."

52. Brown also followed up on February 10, 2025 that he had, in fact, wired $625,000 to Fleming. This representation was false.

53. To date, those funds have never been wired to Fleming.

54. On or about February 20, 2025, Defendant Brown told Fleming that he would wire Fleming $625,000 from FHC's Western Alliance account on February 20, 2025.

55. After several more days (and no wired funds), Defendant Brown then told Fleming that he had gone to Western Alliance Bank personally and actually *had* a $625,000 cashier's check for Fleming *in hand* that he would immediately be sending to Plaintiff.

8

56.   On February 25, 2025, and after many requests for photographic proof of this alleged cashier's check, Defendant Brown admitted that he had lied to Fleming about having the cashier's check in hand, (texting to Fleming: "The truth is, I've not gotten the cashier check yet….").

57.   Instead, Brown said that Western Alliance Bank had *mailed* the cashier's check to him – which he expected to show up in his mail very soon. Of course, to date, Fleming has still never even seen a *photo* of the cashier's check, let alone receive it.

58.   As recently as March 3, 2025, Brown texted Fleming saying that he had the funds in hand, and that he would speak with his legal counsel about whether to send that to Fleming.

59.   Recently, Fleming discovered an article published in the Los Angeles Times on May 16, 2023, that had a photo of Defendant Brown in the title page, and which described a lengthy history of fraud, theft and racketeering allegations and claims made against Brown.

60.   The L.A. Times article describes, in depth, the instances of fraudulent activity with which Defendant Brown has been involved, spanning decades of fraudulent activity involving the funding of film projects, loan agreements, forgery of signatures (including the forging of actor Kevin Spacey's signature in at least one instance), at least one bankruptcy case in which Defendant Brown filed for bankruptcy protection under the alias "David Brown Levy," and an explanation that Defendant Brown (who now frequently goes by David R. Brown or David Raymond Brown) was actually originally named David Addison Brown.

61.   It is unknown to Fleming how many aliases Defendant Brown uses, or has used, but they are numerous.

62.   As are the number of various companies Defendant Brown has created (most,

9

if not all, have been involved in his fraudulent schemes) and the dozens of bank accounts that he has, or is, operating all across the country in furtherance of his fraudulent schemes.

63. Through Plaintiff's counsel's investigations, it has been discovered that nearly every representation Defendant Brown has made to Fleming about the alleged loans, about FHC, ScreenFund, the alleged clients of FHC, and about how and to where Fleming's money was being used was 100% false.

64. Fleming has requested and demanded bank statements from Defendant Brown relating to FHC and ScreenFund, which are required to be maintained and made available to Fleming under both the Operating Agreement and California law – but Brown refuses to produce those bank records.

65. Defendant Brown sent an e-mail to Plaintiff's counsel informing him that, while he agrees Fleming is a 50/50 owner in ScreenFund, LLC, Fleming was never actually named on the Operating Agreement for that entity (which Plaintiff was unaware even existed) and, therefore, Brown would not voluntarily produce any bank statements for that entity.

66. When asked for bank records from First Citizens Bank (to which Fleming's funds were delivered to an account held in the name of FHC), Brown ignored that request and refuses to produce those bank records.

67. When asked for the Western Alliance bank records, Defendant Brown represented to that Western Alliance does not provide bank statements online, rather, Western Alliance was physically mailing those records to Defendant Brown and he would produce them at that time.

68. That representation is false. Western Alliance – as virtually every other bank – *does* actually provide 24/7 access to all account statements, as clearly advertised on their

website.

69. Defendant Brown has either fabricated and/or forged many, if not all, of the supposed loan documents sent to Fleming.

70. *At a minimum*, Brown is repeatedly and intentionally violating the terms of the Company's Operating Agreement to buy more time for himself while refusing to produce bank records and financial statements to Fleming.

71. Defendant Brown's actions and communications over the past year relating to FHC's supposed business operations, match almost exactly the course of conduct for which he has engaged – and been found guilty – in numerous court cases across the country and as described in the May 16, 2023 L.A. Time article.

72. Fleming, through his investment company Red Junior, LLC, has funded more than $11.3 million to Defendant Brown that appears to have been used by Defendant Brown to pay off settlements in other fraud cases, to fund false loans that either do not exist and/or do match the terms he represented to Fleming at the time funds were sent, and have now been completely dissipated to locations that Fleming cannot currently track because Brown refuses to produce any bank records or financial statements for the Company (including ScreenFund, LLC and The Screen Company, Inc.).

73. When confronted with the lack of production of documents (that are needed for both business and tax reasons), Brown gaslit Fleming and argued that he actually *has* provided everything, and they are already in Fleming's possession. This is an absolute falsehood, as Brown has produced virtually nothing that is actually required to be maintained and produced by him.

74. Brown continues to present Fleming with the same, self-serving,

unauthenticated and/or unsigned Word documents or spreadsheets and screenshots of documents that do not actually provide *any* confirmable, reliable or usable information.

75. To date, Brown has produced no record or documents that authentically support any proof of real clients, real loans, distribution of FHC or Fleming funds, returns made on these alleged loan, the actual cash flow of FHC, of ScreenFund, or anything else that is required to be maintained and produced by Brown under the Operating Agreement and by the California Corporations Code.

76. Fleming has now lost nearly his entire life savings to Brown's deception, yet Brown continues to send Fleming near-daily text messages to Fleming attacking him and suggesting that *Fleming* one that is who being unfair to Brown and hurting *Brown's* feelings.

77. Brown recently (March 3, 2025) sent text message images of nearly a dozen different bank accounts (supposedly each owned by Brown) to Fleming in an effort to actually prove that Brown had little or no money in any of his bank accounts.

78. Those screenshots show that Brown is unable to satisfy any monetary judgment that could be entered against him in a court of law, let alone the more than $11.3 million of Fleming's missing funds.

**FIRST CLAIM FOR RELIEF**
(Breach of Fiduciary Duty)

79. Plaintiffs incorporates by reference all of the preceding paragraphs as though fully set forth herein.

80. Defendant Brown, as a member and co-manager of FHC, owed a fiduciary duty to Fleming and to FHC.

81. Defendant Brown violated those fiduciary duties by, among other things, duties by, among other things: changing the members and managers of FHC on file with the California

Secretary of State without Fleming's knowledge or consent; forming and utilizing entities controlled only by Defendant Brown for purposes of misappropriating and disseminating Fleming's capital contributions to FHC; forging documents; fabricating documents; misrepresenting to Fleming that loan proceeds had been received and would be wired or mailed to him imminently while disseminating the funds elsewhere; misleading Fleming about the status of repayment of loan proceeds; modifying the terms of loans provided by FHC without the knowledge or consent of Fleming; opening alternative bank accounts to receive wires and send Fleming's funds through entities controlled only by Defendant Brown, and for purposes of obscuring bank transactions from Fleming; and refusing to make FHC's books and records available to Fleming or provide information about deployment of Fleming's contributions.

82. Defendant Brown's actions and misappropriation of funds belonging to Fleming have directly caused significant financial loss suffered by Fleming. To date, Fleming has received $0 of his $11,324,540.00 invested into FHC.

83. As a direct and proximate result of Defendant Brown's breach of fiduciary duties owed to Fleming, Fleming has been damaged in an amount to be determined according to proof, but which exceeds $11,000,000.

84. Fleming prays for relief following his Sixth Claim For Relief, below.

## SECOND CLAIM FOR RELIEF
(Conversion)

85. Plaintiff incorporates by reference all of the preceding paragraphs as though fully set forth herein.

86. Plaintiff has ownership over the funds distributed to Brown under false pretenses, in the total amount of $11,324,540.

87. Plaintiff has ownership of or the right to possess all bank statements that are in the

possession and control of Defendant Brown and which reflect the receipt, use of and distribution or deployment of Fleming's funds and/or any funds that were used, or allegedly used, in connection with FHC.

88. Defendants exercised unauthorized dominion and control over Fleming's funds when they distributed them without authorization, re-deployed them without authorization, and/or refused to remit to Fleming the principal or proceeds of loan transactions.

89. Plaintiff has demanded the return of his funds along with the production of these bank account records, statements and other financial records of FHC.

90. Brown refuses to return Plaintiff's funds and to produce the bank records, statements and other financial records of FHC.

91. Fleming prays for relief following his Sixth Claim For Relief, below.

### THIRD CLAIM FOR RELIEF
(Breach of Operating Agreement)

92. Plaintiff incorporates by reference all of the preceding paragraphs as though fully set forth herein.

93. The parties' Operating Agreement for FHC is a binding and enforceable contract between the parties.

94. Fleming has performed all terms, covenants and conditions on his part to be performed pursuant to the Operating Agreement, except those terms, covenants or conditions excused or made impossible by the breaches alleged herein.

95. Brown has breached the Operating by, among other things, "adopting one or more fictitious business names for the Company [e.g., ScreenFund, The Screen Company, and/or Film Holdings Fund Partners, LLC] with[out] the written approval of both Members," pursuant to Section 1.2; taking numerous actions and made numerous decisions regarding the Company's

business and affairs without joint authority or written approval of both Members as required by Section 3.1; failing to compile or maintain complete and accurate books and records for FHC as he is required to do under Section 4.1; failing and refusing to distribute revenues from loan transactions as they become available as required by Section 8.15, misappropriating Fleming's funds, refusing to produce FHC and ScreenFund bank account records, and by refusing to produce all financial records of FHC and ScreenFund (FHC's d/b/a entity).

96. As a direct and proximate result of Brown's breach of the Operating Agreement, Fleming has been damaged in an amount to be determined according to proof, but which exceeds $11,000,000.

97. Fleming prays for relief following his Sixth Claim For Relief, below.

## FOURTH CLAIM FOR RELIEF
(Unjust Enrichment)

98. Plaintiff incorporates by reference all of the preceding paragraphs as though fully set forth herein.

99. Brown has received and retained, under false pretenses, $11,324,540 of Fleming's funds, along with any revenues, interest or proceeds generated by those funds at the expense of Fleming.

100. Brown has admitted that he received those funds, but has failed or refused to return those monies to Fleming.

101. Fleming prays for relief following his Sixth Claim For Relief, below.

## SIXTH CLAIM FOR RELIEF
(Accounting)

102. Plaintiff incorporates by reference all of the preceding paragraphs as though fully set forth herein.

15

103. A relationship exists between Fleming and Brown that requires an accounting of FHC's business records, financial records, tax records and bank records/statements.

104. Per the terms of the FHC Operating Agreement, Brown was charged with the day to day operations of FHC, including the record keeping.

105. Brown has sole access to the financial and bank records of FHC and ScreenFund, but refuses to deliver them to Fleming, as required by the Operating Agreement and California Corporate Code.

106. Money is owed to Fleming, but he is unable to determine the amount so owed without an accounting.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant, and award him all relief as allowed by law and equity, including, but not limited to the following:

1. All appropriate relief at law and equity;

2. Temporary and Preliminary Injunctive relief;

3. Actual economic damages as established at trial;

4. Compensatory damages;

5. Issuance of an Order mandating appropriate equitable relief;

6. Pre-judgment and post-judgment interest at the highest lawful rate; and

7. Such further relief as justice requires.

Dated this 6th day of March, 2025.     Respectfully submitted,

**CYLG, P.C.**

*/s/ Christopher A. Young*
Christopher A. Young, #34207
CYLG, P.C.
1750 N. High Street
Denver, Colorado 80218
Telephone: (303) 333-1252
cyoung@cylgpc.com

*Attorneys for Plaintiff Edward Fleming*

17